May it please the Court, my name is Douglas Johnson, and I represent the appellant, Johnny Walker, DBA PJ's Auto Body Shop. I'd like to reserve two minutes for rebuttal. The first issue, there's three here today. The first one is whether or not a plaintiff getting an injunction under 17-200 needs more than Article III standing. A second issue is whether California law recognizes a cause of action for unjust enrichment. And third, whether or not there's been a Cartwright Act claim here in this case. So the first issue, the law in resolving the first issue is what would the California Supreme Court do? The law says we must look at what they're going to do. What do we think they're going to decide? Well, there's a case right on point, 2007, the Fireside case, where the Supreme Court says we envision in a class action under 17-200 two classes. One, where there's no money paid out, just that there's threatened harm. And two, we'll have a class for people that are actually entitled to restitution when they pay money out of their pocket. So the California Supreme Court has held that only Article III standing is required when an injunction is sought under 17-200. And that makes a lot of sense, because injunctions are to prevent harm. They are prospective and they're looking. And if you have to already pay money out of your pocket, you've already been hit by the bus. Wait. How has your client paid money out of his pocket? He doesn't have money out of his pocket under career supply. I do not put to you that he does have that technical definition that career supply gave when you want restitutionary damage. Remember, that language that Lockheed gave was when there was no Prop 64, and their concern was that there was no standing requirement. You had an uninjured plaintiff. So the Supreme Court said, we're going to give lost money or property a very technical, narrow definition because the statute's so broad, and we want it to be broad, but we're going to really put a narrowing thing on the money that you receive in this statute. That no longer is here. Prop 64 is here now. The Supreme Court's limiting language no longer needs to apply. I'm — that was very eloquent, but I didn't hear an answer to the judge's question. Oh, the — How has your client lost money? My client lost — What's the economic loss? The economic loss is that the customer came into his body shop, signed a contract, and said, I want you to repair my car. And under California law, it's called the repair body shop's bill of rights, and it says that any consumer gets to go wherever they want. They get to pick their own independent body shop. So the customer goes, and they say, okay, and my client says, that's my posted labor rate, and that's what I'm going to do the job for. The insurance company, who has no contract with my client, is basically an intermeddler. They come in with a checkbook, and they say, you know what, we've done this survey, because we're going to cap this rate, and so if you're going to cap the rate, you've got to do a prevailing rate survey. And prevailing, under the common meaning of that word, means the most commonly occurred charge. So the insurance company brings in these surveys and says, I'm not paying you what your rate is. I've done a survey here, and you're overcharging. And so my client then is stuck. The customer is put in the middle, and then the customer says, I was going to pay you that, but the insurance company is not paying you. So my client loses that money on the job. They have lost there. They are at a disadvantage. They don't receive the prevailing rate, the common occurring charge. What you want to charge.  What you want to charge. No, not just what I want to charge. I think the law says that if you want to make a prevailing rate survey, you have to find the prevailing rate. And I'm fine with fair numbers. If they really do a prevailing rate survey and don't use artificially low numbers, we'll take that rate. We're fine with that, because that's what the law says. My posted rate, if you do a real survey and I'm a little too high, I'm fine with that. But to come in with surveys that have false, spurious numbers and tell me that I'm overcharging, I don't even know where you're getting these numbers. I don't know the scheme. You just come into my shop. And all of a sudden the consumer looks at my client and says, are you overcharging me? And so my client is kind of in a conundrum. They're either going to eat and have work or that car is going to go to their own insurance body shop. The insurance body shops charge those low rates. It's a wholesale contract. And so if my client doesn't do the work, that car goes to their shop. Well, you call it a spurious rate, but if they go out and say, you know, we don't want to pay too much for some body shop work, so we think this job is worth $200 less than you want to charge, and the body shop says, oh, all right, we'll do it for $200 less. It's not your shop, but another shop. Why is that a spurious rate? It's not. What is spurious is that the numbers that are used in these surveys are from their own direct repair providers that negotiate saying, you give me 100 cars a month and I'll do it for $10 less. But wait a minute. My client is not a DRP shop. They are an independent body shop and have a right not to be connected to the insurance companies. And California has a bill of rights that says the consumer gets to go to any body shop they want. We don't want to go to the insurance company's body shops. That was why the whole bill by Jackie Spires was made, because people were tired of getting forced to go to the insurance company's body shops. Well, these surveys ---- You want the freedom to pay more. What do you mean? If the client wants to pay more? Yeah. That's what you're saying, isn't it? Well, I don't want the client to ---- Do you think that insurance clients, insureds, want the right to pay more? They want the right to go to their own body shop, which means that the insurance company should pay the prevailing rate for that work, not what their own body shops are charging. What does the contract say between the insurance company and the insured? Well, there's no limit on what body ---- They get to pick their own body shop. They get to go to their own body shop, and there is no language for these two carriers that limit it in any way. You know, is there any reason ---- I'm just going to point out, because I'm not understanding. Is there any reason why, if somebody really wanted to go to your body shop and their insurer said, we're only going to pay $50 to fix that dent, and you say, well, it's going to cost $100, that the consumer can't pay the other $50? Well, that's really the problem, is that we don't want to put the consumer in the middle. The consumer had the right to go to any body shop that they wanted to. And so if I'm understanding your question ---- And to require the insurance company to pay any charge the repair shop has posted? No. The regulations in place state that it's supposed to be done, if you want to cap and not pay a body shop's posted labor rate, that you do a prevailing rate survey. And this is where the problem lies, is that we don't think they're fair. If they want to do a real survey that has statistical validity, then take a normal sampling of what all the body shops in town charge, not just your own or certain shops that have been out of business for three years. I mean, they artificially pick prices to make sure that that rate stays very low. Are they compelled to do a survey? No, they are not compelled to do a survey, but then they can't cap the rate. The insurance code says if you want to cap the rate and tell the body shop what it's going to get, you have to do a survey, a prevailing rate survey. I'll inquire further. The next way to look at this new language in Prop 64 is to just do a plain language reading of the words. There is no reason to make a hyper-technical definition of lost money. And I think the Myers case lays that out and says when interpreting a voter initiative, you use the same rules of statutory construction that you do when you interpret a statute. And the first one is just a plain language, common sense understanding. And you go no further when that rule of construction resolves the legal issue. And I say here it does. Lost money or property in the most common understanding is not that complicated, and Myers sets that out. When the language is ambiguous, then you look to the analysis and arguments contained in the official ballot pamphlet. Sotomayor, what money do the insurance companies have that belongs to you? They saved money. They were supposed to pay the prevailing rate. And instead they didn't. Remember, the body shops didn't know the scheme was going on. They were put with the survey and they thought it was valid. It's not until now that we found out that actually those weren't normal numbers from the guy down the street and the guy across the street. So they're saving. Remember, the insurance company had a huge duty here. Sotomayor, let me ask it in a different way. What is the injunction that you want? If you were right, against the insurance companies, what would it be? I want them to stop using artificially low rates from their own wholesale contracts as setting the conclusion. That's a conclusion. Artificially low, that doesn't tell them what to do. So what is it that you want? I want fair surveys. I want to stop them from using false numbers that are hurting me, that I'm not getting the right amount anymore because the numbers you're using are really not fair. They're not really statistically valid. And so I want to stop that practice and create a fair number. I'm not saying that my body shops are always going to have the right number, but we don't want to be stuck in a situation where we have to take a number that they have a wholesale contract. So your injunction would say, in effect, to the carriers, stop engaging in a practice which lowers the cost to insureds of car repair. Well, I say it doesn't lower the cost to the insured. I mean, we want to they want to. Listen, I was born at night, but not last night, okay? If your clients weren't charging more and they weren't getting less, we wouldn't be here, right? True. Okay. So is that what your injunction wants? U.S.A. Geico, stop making efforts to save money for your insurers on car repair. No, Your Honor. That's not what I'm saying. The whole purpose of going to your own independent body shop is because you want your car repaired safely. This is also about insurers do not. There was a big problem, and that's why these laws were passed saying I get to pick my own independent body shop. And I'm saying if you effectively say the consumer has to pay out of its pocket, they don't really have a choice anymore. They don't really get to go to their own body shop. You know? And that's what I want to happen here is to give them a right, a real right. If they go to the body shop and then the insurance comes in and says, we're not paying, effectively I'm saying they have no right to choose an independent body shop. Sure they do. Well, they'd have to pay out of their own pocket, but. Something. Well, and a lot of times for consumers, you know, that's really hard on them. And they expect their insurance to come through in this situation. And, hey, I've been going to Johnny's for 15 years. I trust them. I want my car fixed there. And so I'm just saying when they come in with that spurious survey, it creates a bad situation. Either the car is going to go to another repair shop or the client is out of pocket. Do the contracts with USA and GEICO give the insured the absolute right to unilaterally select the place of repair irrespective of price? Your Honor, I don't know the question to that answer. But I know that there's two regulations in California. I think you mean the answer to that question. I don't know the answer to that question. I don't know whether in the contract it absolutely gives them an affirmative right. But I do want to say that there's two regulations in California that do give the consumer the right to choose. On the Prop 64 issue, the last thing I just want to say is that the intent of the voters was to prohibit private attorneys from filing lawsuits for unfair competition where they had no client who had been injured, in fact, under the standing requirements of the United States Constitution. So we need to go no further to effectuate that intent than just using the plain language. The second issue in this case is whether or not there is unjust enrichment in California as a cause of action. And it's been there for a long time. And, again, what does California say? What does the Supreme Court say on this issue? Let's look at the tea leaves. Kagan. This is the near image of what we were just talking about, isn't it? If they've been enriched, let's suppose, because they have money or something that you say your clients should have. Under unjust enrichment, any benefit conferred to the other side, even saving of expense. But now we're back to the benefit being that they're paying less money, that they're paying lower costs for insurance, for the repairs for their insurance. Yes. They're saving the difference between the survey rate and what the prevailing rate should be. If they're going to do a survey, let's look at the prevailing rate and find that number. But I'm saying if we don't keep independent potty shops around, all the potty shops left are just going to be for the insurance companies. So it's important that we pay them a fair rate. We want quality work here. And they're saving the expense of paying the normal, customary, prevailing rate under the statute. Girardo says we have a cause of action for unjust enrichment, and it says that we adopt the restatement of law of California that sets forth the causes, the elements of that cause of action. The cases that are cited by the defendants on this issue don't even mention Girardo. They don't even talk about it. And they don't talk about the restatement at all that lays out the unjust enrichment. So I say to you, and let me say, there's a lot of opinions that say there's unjust enrichment in California, and those ones all cite to Girardo, and they all cite to the restatement. The Casson case, the Hirsch case, the Lector-Dryer case, the Marina Tenants case, the Solano case. And most recently, in the North District California court in 206 Norberg, Norberg says we've looked at the muddy waters of all these State opinions on unjust enrichment, and we reject the trifling distinctions, and we go on to hold that plaintiff in this case could properly assert a claim for restitution based on the theory of unjust enrichment. And if you look at the Supreme Court's case, they call it a cause of action four times, and they call it a theory of law several. So if you look at the one case that started that all the cases on the other side go, the ones that say there's no unjust enrichment, they all cite to Melchior. And in Melchior, again, it's a case that doesn't talk about the Supreme Court case or the restitution. And all the cases that go the other way cite to Melchior. So I say that the better analysis is what the Supreme Court would do, and that is what Gerardo says to do. And I say that for a long time, we've had unjust enrichment. It comes from the chancery courts. It's been important in our law for a long time. Sometimes laws do not give justice to people. And we know that there had to be a separate court to set up to say, we as philosopher kings, as judges, can define what justice is in our society. We don't need rigid rules of law. We can say, was this right? Equity is to do right and justice. It is to be flexible and expansive, always in order to meet the requirements of new things, because new wrongs are always constantly committed. The law can't keep up with new schemes that are always devised to get around laws. So I say it's an important thing here. And body shops and consumers really need that tool in their tool bag to come in here and say, what's going on? It's not fair. It's not right. Thank you. Thank you. We've got about two minutes left. Thank you. Good morning, Your Honors. Richard A. Derivan for GEICO. Let me start with a few basics, if I might. Under Section 758.5 of the California Insurance Code, and it says, no insurer shall require that an automobile be repaired at a specific automobile dealer. So the answer is the policies do not and cannot prevent an insurer from going to a body shop of his or her choice. And, in fact, the statute goes on to say that an insurer cannot even recommend a body shop unless either the claimant requests a referral or, B, the claimant is told in writing that they're not required to use that shop. So the limitation on consumer choice is just not there, because consumers can go anywhere they want. The question is, how do you determine the rates? And remember that GEICO does not have a contract with the body shops. Its contract is with its insurers. And to answer Judge Hawkins' question, the GEICO policy, admittedly it's not on the record, but what it says, and I think this is typical of insurance policies, is that our liability for loss is that we will pay the cost to repair or replace the property with quality of like kind and quality. So that's essentially our obligation is to repair it to like kind and quality. That's the obligation of the insurer. Could you explain how these surveys are supposed to work? Well, the allegation and complaint, of course, is that we don't do surveys. And there's no survey requirement under California law. There's some regulations that talk about what a survey may be. But essentially, I think what it is, is you go to different body shops in the relevant geographic area and you find out what their rates are. Insurance companies obviously also learn rates when they adjust claims. I mean, that cannot be a survey, because just the process of adjusting claims and learning information is not a survey. But what it is, is going to shops in the area, finding out what their posted labor rates are, which are typically an hourly rate. And that's really what the dispute is here, hourly rates. But getting back to the 17200 question, if I might, the Buckland case that was decided shortly after the district court issued its decision, about six months after, we think is on all fours with this case. The Buckland case plainly says that you look at both prongs and you have to meet both prongs for standing. That's in footnote nine. One prong is injury in fact. The second prong is lost money or property. And lost money or property in California under the UCL has taken on a very defined meaning, which means either property that the plaintiff once possessed or property in which the plaintiff had a vested interest in. A vested interest case is an overtime case where an employee is entitled as a matter of law to payment for overtime. That's a vested interest case. The Buckland case was a little bit odd, because in that case the plaintiff had actually paid money to the defendant. And the question is whether that payment was lost money or property. And the court said, well, it's not lost money or property for the purpose of the statute, because the payment was made solely to be able to bring the lawsuit. And that was made without coercion, without mistake, without anything. That can't be lost money or property. But on the legal issue, do you have to meet both injury in fact and lost money or property? The court was very clear on that and said that you do. And what we've heard today is that Johnny Walker simply cannot meet that prong of the test, because there's no payment from him to the insurance company. He has no vested interest in a particular rate. What he's really looking for, what he's really saying when you cut through it is, I have a contingent expectation in a lost profit, and the profit being the labor rate that I want to charge, regardless of whether it's competitive with other rates. And since under the UCL, damages are not an available remedy, and what he's really saying is I've been damaged, then he's not entitled to standing. And we think when you look at 17-203 and 17-204, that combination test applies equally when the party is simply seeking injunctive relief. That's the plain language of the statute is it's got a conjunction in there. It applies to restitution. It applies to injunction. And I want to emphasize there is a safety valve in the statute as well. And the safety valve is that certain elected officials, the attorney general, district attorneys, city attorneys, can bring a suit for injunctive relief without meeting any standing requirements. So if there is, in fact, a problem, it can be remedied by an elected official bringing a suit on his or her own. And that was really the import of Prop 64. Prop 64 was to limit suits brought by private plaintiffs because pre-Prop 64, there needed to be no injury requirement you could bring on behalf of the general public, and the electorate said there's too many suits that we don't think should be brought. And so we are going to impose a standing requirement on private plaintiffs that representative plaintiffs have to meet as well. On the Fireside case that counsel cited, I don't think that case supports his argument that the California Supreme Court has held you don't need to meet the lost money or properties prong of the test. In Fireside, there were several different claims for relief, only one of which was brought under the UCL. And the only comment in Fireside that addresses this at all is in footnote 8, in which the court drops a footnote, no authority, no analysis, and simply says, you know, there may be appropriate for subclasses, but they don't say which claims those subclasses might relate to. They don't say that those subclasses would be appropriate under the UCL. And so I don't think you can take this very general, unsighted footnote in Fireside and say that the Supreme Court has held that. I don't think the Supreme Court has discussed that at all. I think the Buckland case is the case that really stands for the proposition that you must meet both. So I don't think I need to address that any further unless there are questions. And I'll move on briefly to the UCL, but I don't want to take up all the time on our side because USAA does have a question. One of the questions I have is whether you are using surveys to get to a cap. No, Your Honor. If I understood your opponent this morning, he said, yes, that's what you're doing. No. What we're doing is we are obviously, the adjusters know what the rates are in the geographic area in which they operate. There's no allegation that we've actually done surveys. The allegation is to the contrary. And so what they do is they know what rates certain repair facilities charge, and they will say, look, we will pay this rate. And adjusters have some measure of discretion to pay higher and lower rates, and it's not, you know, a bright line that they have to pay X. They have no authority to do more. But the fact is they do know what's appropriate in the area, and it's a competitive business, Your Honor. And the point is that we are competitive on two levels. Price and service. And insurers first shot for price. And if they like the price, they'll buy a policy. But if they have a bad experience on a repair or a claim, they're going to get on the phone and go somewhere else. So it's not as if insurance companies only are looking to do the worst job possible at the cheapest price. They're looking to get their insured a good repair at a reasonable price so that they cannot lose an insured and keep the premiums low to attract more insured. And what this case at bottom really wants to do, and I think maybe Justice Hawkins put his mind on it, is seek a judicial sanction of a right to charge a higher rate. And that is not what the UCL is about. It's not what unjust enrichment is about, and it's not what antitrust is about. And with that, I'll cede the rest of my time to counsel for USAA. Good morning, Your Honors. I'm James McGuire, Morrison Enforcer for USAA, and I think I can be brief. Going to Judge Hawkins' question, the USAA agreement with its insurers is, of course, outside the record, but it's very standard in the industry to have precisely the language that co-counsel read, which is that there's an obligation of the insurer to restore the vehicle to its pre-accident condition and in operation, but there's no cap on rates, nor is there an agreement to pay whatever invoice happens to be presented regardless of price. Touching briefly on the surveys, California Insurance Code Section 758 is plain on its face that the conducting of surveys is purely optional. There's no obligation to do it. What the allegation in this case, of course, is that we're entering into, and this is going to touch on both the sort of insurance regulation aspect of this as well as the antitrust aspect, is that what we're doing is we're negotiating volume discounts with essentially suppliers of body repair services and then turning to an insurer, as they're entitled to do, goes to an independent body shop, and the independent body shop, we turn to them and say, this is what we can get this repair done for X dollars, and we don't want to pay you 2X dollars. Is there any advantage to doing surveys? Is there any legal advantage to doing surveys? Not that I'm aware of, Your Honor. For example, might there be immunity from these types of challenges or something like that? No, not at all. When I asked your opponent that question, it was, well, if you want to impose a cap, you have to do surveys. That's simply not accurate. That's not what the statute or the regulations say. It says that you can do them. Now, I will note, of course, and we've cited this in our brief, that the California Department of Insurance has looked at this scheme and said essentially this is a mess and nobody really understands what they're supposed to do, and so they promulgate it, and they've more or less said that we really need to clarify this. Those regulations are still pending. But as the statute reads, it's just a purely optional, and there doesn't appear to be any up legally. There's no upside or downside to doing it. Well, do you negotiate volume discounts? What's going on here? I mean, I'm not sure that there's anything wrong with that. Right. Certainly, Your Honor, the allegation of the complaint is that we do. And we have to accept that. Yeah. I mean, I can represent that, in fact, of course, much like all of us in our daily lives negotiate volume discounts at some level or another or engage with people who do, because it tends to be an economically advantageous thing. I suppose we expect insurance companies to do that. I certainly do. I don't presume to speak for you, but I think like Judge Hawkins, I prefer to pay less than more for my insurance. And as co-counsel said, if I'm dissatisfied, I would likely go out and shop for a different insurance company. But if somebody wants to have a particular – I have a Tom's Body shop that in Phoenix, if I want to go there and they want to charge me more than my insurance company is going to pay, I can pay in a different way. You're absolutely entitled to go there. We do not have any contractual or legal obligation to pay whatever number is presented on that invoice. And that is counsel's position, is that we do, is that they have an absolute right to go wherever they want, and they have an absolute right to have us pay for it. And that doesn't make any sense in any context. Nobody would agree to that. And we certainly haven't. Touching just briefly on the antitrust issue, and I know the panel didn't have questions for co-counsel about that, I mean, what we're talking about here is really, and as alleged in the complaint, is an agreement to negotiate for a volume discount from certain suppliers. And that is not, under any stretch of the imagination, anti-competitive conduct. It's not horizontal price-fixing. They refer to it as price-fixing occasionally. But people do that all the time. People go out and they, not price-fixing, people go out and do what is alleged here all the time. They go out and negotiate for volume discounts, and they pass that savings on to their customers. If this were really an antitrust case, I'm having a little trouble getting my arms around this as an antitrust case. They're not suing people who are in the same business. They're not suing competitors. They're not suing their own competitors? No. They're alleging that we are conspiring with their competitors to drive prices down, which doesn't make any sense whatsoever. I don't know why their, why would their, what would their competitors' interest be, other than, of course, obtaining volume discount. But they don't have any interest in driving their prices down. You know, they do have an interest in taking business away from them. But lower prices … They maximize their profit if they can get volume discounts on their products. Sure. Sure. But, you know, lower prices is, and we, you know, we can tell you any case you have … They have lower prices if they can't buy it. You know, is the object of antitrust law. It's not a problem with antitrust law. Right. Which is the way the market is supposed to work. Exactly. Which is what the district court said. Exactly. I do want to bring to the Court's attention, and we submitted to the clerk, and I'm certain you have not had an opportunity to look at it, a case that we have submitted called Quality Auto Body Inc. v. Allstate Insurance. The Seventh Circuit case. The Seventh Circuit case. I don't want to argue it because counsel has not had an opportunity to see it. We provided him a copy this morning, but I did want to make sure that the Court … There's a section entitled Vertical Pricing Arrangements where they discuss really the identical situation here. I apologize that we didn't have it to you sooner. With that, unless there are further questions, I will. Thank you, Your Honors. On the first point, the case Buckland is good for us, actually. It does not hold that you apply the Lockheed hypertechnical definition of lost money or property. The case holds that you only need Article III standing and that it defined lost money and property as a qualifier of injury in fact. So the case is still saying what I said. The next thing, though, is important to look at because the Supreme Court is going to do this. They have a case. It's a Supreme Court case called ABC International Traders that said … This is a California Supreme Court case? California Supreme Court case 14, Cal 4th, 1247. That case held that UCL remedies are not contingent upon each other. The injunction portion of this statute has existed. It existed for half a century before in 1976 the legislature wrote one sentence allowing restitution recovery. So the Court says that on the face, the two can't be linked, because what they're saying is they want them to be linked, that I'd actually have to be proved restitution under the career supply case before I ever got an injunction. So it would be a prerequisite to me ever getting an injunction. Well, they might just be saying what you would be trying to enjoin must at least be a future actual loss. And they're not sure that at least they say that that wouldn't be the case. Well, here we would have future harm. And I say to you, you know, the counsel brought up that, hey, what's wrong with driving down rates? Well, for the DRPs, it's great, because all the independent body shop work will be steered right over there. You've got to pay out of your pocket customer, car goes over to the DRP. DRP wants the independent shops to play on their level. They'd love for them to take that price, even though the independent shops don't get the volume discount. They don't get the volume work. So they can't … These DRPs, what's happening now is that they've got to cut so many corners to make a profit off that low number, and they're pulling cars out of there. They're pulling them out. So why should we make the independent body shops be DRPs they don't want to be? And the DRPs are steering by this scheme. They want the rates to lower, because then they can get all the work. It's not the agreements themselves that I'm saying are antitrust at all. It's how the carriers manipulate that DRP rate as a means of coercing all the body shops to accept artificially low rates. I'm not saying that wholesale contracts are bad, but when you deprive consumer choice, you have … you constitute antitrust injury. Recent Ninth Circuit case, Theme Productions v. News America Marketing, 546F991. And it holds. The reduction in choice in market alternatives is antitrust injury. Okay. Thank you. Thank you, counsel. The case just argued is … matters just argued are submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Nelson, Roth